## Whiting G. Press v. B. M. Hair.

### Gen. No. 13,230.

1. Instructions—*when particular accuracy required of.* Where the evidence is sharply conflicting, with the apparent preponderance upon the side of the defeated party, great accuracy is required in the instructions given to the jury.

2. Deceit—*what essential to establish cause of action for.* In an action for fraud and deceit, the fraud and *scienter* constitute the cause of action. The representations relied upon to constitute the fraud charged must be of some material fact, in reliance upon which, in the exercise of ordinary precaution to guard against deception, the complaining party acted, and so acting was deceived to his damage, and it is equally as important to establish the *scienter* by proof that the representations were known by the party making them to be false at the time.

3. Deceit—*when instructions in action for, erroneous.* Instructions in an action of deceit are erroneous which leave the jury to determine or conjecture what allegations of the declaration constitute ground for a recovery, where part of such allegations are matters which might not constitute the subject-matter of a legally false representation.

4. False representations—*what do not constitute.* Representations as to matters of opinion, as to what may occur in the future, however unwarranted they may be, will not support an action of deceit.

5. False representations—*what may be relied upon.* Representations, though false, must be of facts legally to justify reliance thereon.

6. False representations—*what may be relied upon.* Representations, though false, must be such that an ordinarily prudent man would rely thereon as true, to sustain an action of deceit.

7. Verdict—*when disturbed as against the evidence.* A verdict which is supported only by the plaintiff's testimony, which is contradicted by four apparently equally credible witnesses, will be set aside as against the weight of the evidence.

Action for fraud and deceit. Appeal from the Superior Court of Cook County; the Hon. Arthur H. Chetlain, Judge, presiding. Heard in this court at the October term, 1906. Reversed and remanded. Opinion filed April 29, 1907.

John W. Ellis and James R. Ward, for appellant.

Press v. Hair.

JOHN P. AHRENS, for appellee.

MR. JUSTICE HOLDOM delivered the opinion of the court.

This is an action for fraud and deceit, in which appellee prevailed in the trial court, securing upon the verdict of a jury a judgment of $2,299. Appellant, to reverse the judgment so obtained, seeks a review of the record, assigning errors therein, and urging upon us in argument that the judgment is contrary to the evidence and that the trial judge erred in giving, at the request of appellee, certain instructions and in refusing instructions asked by appellant, and in modifying other instructions tendered by appellant, and in not giving them as tendered.

The controversy involves a purchase by appellee from appellant of 25 shares of the capital stock of the Storm Cloud Gold Mining Company, an Arizona corporation, at the par value of $100 per share, upon the alleged false and fraudu lent representation made by appellant to appellee, that on April 19, 1898, he, appellant, was the owner of certain gold mines and mining property in the Territory of Arizona, of the value of more than $100,000, and intended to and would convey the same to the Storm Cloud Gold Mining Company. That appellant was and for some time had been engaged in mining and extracting and selling gold ore from the aforesaid mines and mining property, and was carrying on the said mining business at a great profit, sufficient to enable the corporation, on acquiring the mines and mining property, forthwith to pay the holders of its stock, out of such profits, consecutive monthly dividends of 1 per cent upon the par value of the stock, and that within six months the corporation would be able from its earnings to double its dividend of 1 per cent per month; all of which representations appellee confided in and believing them to be true bought the stock, paying cash for one share and giving his note for $2,400 for the remaining 24 shares, which note he subsequently paid. That all the representations so made were untrue, and so known to be by appellant at the time he made them; that as a matter of fact appellant did not, at the

time of making the representations concerning the mining property, and never has been, the owner thereof, and consequently could not convey the mining property to the corporation. That all the claim appellant had to such properties rested in an executory contract from the owners to him upon payment of a large sum of money. That appellant never carried on the business of mining or the extracting or selling ore from the alleged gold mines at a profit. There are many averments in the declaration of opinions of appellant in relation to future conditions of the mining property and its remunerative product, which do not *per se* constitute representations of existent facts. Pleas of the general issue and the five year Statute of Limitations were interposed, the latter of which was sought to be avoided by appellee's replying double; first, that the falsity of the representations was not discovered until the summer of 1903 thereafter, and, second, that appellant during seven months in the years 1889 to 1903 inclusive resided out of the State. To the first replication appellant filed a *similiter,* and to the second replication rejoined by traversing the averment of absence from the State.

As to the representations which appellee insists constitute the fraud here charged, the parties themselves are the only witnesses. They are in direct and irreconcilable conflict. Hair says Press told him he owned the mines and was going to form a stock company with a capital of $100,000, and wanted him to take 25 shares of the stock. Press denies this *in toto.* His version of his talks with Hair are to the effect that he went out to Arizona while the witness Tullgren, on whom he relied, was there, and went over the properties with him. Tullgren told him they were good properties. They thereupon talked with Williams, the owner. This talk resulted in the option contract in evidence, which contract, after it was recorded, Press swears he showed Hair in his conversations with him before he agreed to purchase the 25 shares. That Hair knew that all the interest Press had in the mining property was under the terms of the Williams contract. That under that contract possession was taken,

and two "Tremain Stamp Mills" installed, with which between 6 and 8 tons of ore per day were taken out during the month of April, and that during 1897 and 1898, until the formation of the Storm Cloud Mining Company in April, 1898, they realized from the ore taken out between $75 and $100 a day. Denies that he told Hair he was the owner of the mine. Press says he communicated to Hair all the information furnished him by Tullgren in regard to the mining property and the glowing predictions as to its future value, and also told Hair that he was putting in his money in the faith of Tullgren's statements and on his judgment. It was, Press says, agreed at the meeting completing the organization of the Storm Cloud Gold Mining Company, when all the parties interested but Tullgren were present, that the company should commence to pay a monthly dividend of 1 per cent upon the capital stock. We gather from Press' evidence that the dividends were paid from the earnings of the mine prior to the drought which suspended all mining operations in the Arizona mining region. In faith of the Williams contract, and in anticipation of availing of the option to purchase the mining properties at $50,000, Press says he put in a mill at a personal cost of more than $3,000, and set to work between 25 and 40 men developing the mines, the cost of which he says was borne by him, and that he lost in this mining enterprise something like $20,000.

While Hair claims entire ignorance of the Williams option contract and denies that he ever saw it or learned of its existence until the summer of 1903, yet the records of the Storm Cloud Gold Mining Company show that on April 26, 1896, at the meeting when officers were elected, at which meeting it is conceded Hair was present, the Williams contract was read and a resolution accepting an assignment of it from Press to the corporation authorized for the consideration of 996 shares of the corporation stock. At this meeting Hair was not only present, but took an active part. . It was he who nominated Press for president and accepted an election as vice-president, and seconded the motion authorizing a purchase by the company of Press' interest in the Williams con-

tract. On the next day another meeting of the directors of the corporation was held, at which Hair was present, and the minutes of the previous day's meeting, including the resolution accepting an assignment of the Williams contract from Press for 996 shares of its stock, were read and approved. On these material matters corroboration is found in the evidence of Mrs. Louder and Messrs. Law, Bates and Ellis. All the persons present at the meetings of April 26 and 27, 1898, corroborated the record and the testimony of Press as to what occurred. Hair admits that it was not until after these two meetings that he gave his note to Press for $2,400 as payment for 24 shares of the stock which he bought of Press in accordance with a prior agreement made with him to do so. The only other meeting of the directors of the Storm Cloud Gold Mining Company was held January 4, 1901, at which Hair was present, and at which the only business discussed or acted upon was a new agreement negotiated by Press as president of the company with Williams to supplant the one made by Press and assigned by him to the company. The resolution is as follows:

"Be It Resolved, By the board of directors of the Storm Cloud Gold Mining Company, that certain contract or agreement, in writing, made and entered into at Prescott, Arizona, on December 18, 1900, between Frederick W. Williams and Abby Williams, as party of the first part, and the Storm Cloud Gold Mining Company, as parties of the second part, such contract or agreement being executed by Whiting G. Press in the name of said Storm Cloud Gold Mining Company as president, of and in behalf of the company, is hereby ratified, and all the acts and doings of said Whiting G. Press as president of said company in connection therewith are hereby ratified and confirmed."

There is, therefore, in this record evidence that on four different occasions the Williams contract and Press' interest in it, and the character and extent of his rights thereunder were directly brought to the notice and attention of Hair. It also appears from the evidence of Bates and Press that

the Storm Cloud Gold Mining Company was organized about two years later to take over and in a measure supplant the Storm Cloud Gold Mining Company. Hair admits that with his consent given to Press, he was elected a director and vice-president of the new company, making his official connection with the new company correspondingly the same as that which he sustained to the first company. In a discussion between Press, Bates and Hair it was agreed to endeavor to procure financial assistance to enable the new company to make the payments under the Williams contract with the Storm Cloud Gold Mining Company, which, if successful, it was said would result in giving the control of the mines to the Storm Cloud Company.

Tullgren, the witness of Hair, although a director in the Storm Cloud. Gold Mining Company, was only nominally interested as a stockholder, he owning but one share, although he says he was to have 200 shares if the enterprise succeeded as anticipated. He was the mining expert in charge, and under whose direction the developing of the properties was made. His testimony establishes the truth of the material statements as to the conditions of the property, which Press learned from him and afterwards communicated to Hair. The mill was at the mine. Press was virtually in possession under the Williams contract. Gold was taken out of the mine to an amount bordering on $30,000, and a small margin of profit earned on the output. Further operations ceased in June, 1898, owing to a drought which then prevailed in Arizona. As it was impossible to prosecute mining operations without water, there was no alternative but to suspend, as was done.

With such conflicts in the evidence plainly appearing from the foregoing recitations from the testimony, accuracy in the instructions to the jury upon the law was imperative.

With the crucial question of fact resting in the testimony of one witness affirming, and four witnesses in denial—all of the witnesses, so far as the record discloses, being equally credible and worthy of belief—it is of the essence of a fair trial that the jury be instructed with exactness as to the law

applicable to the facts of the case and the contentions of the parties appearing from the pleadings.

In actions for fraud and deceit, the fraud and *scienter* constitute the cause of action. The representations relied upon to constitute the fraud charged must be of some material fact, in reliance upon which, in the exercise of ordinary precaution to guard against deception, the complaining party acted, and so acting was deceived to his damage, and it is equally as important to establish the *scienter* by proof that the representations were known by the party making them to be false at the time. The necessity of maintaining these propositions by proof is axiomatic to warrant and sustain a recovery. The representations alleged to be false must relate to matters as existent facts, or to past occurrences. Representations as to matters of opinion, as to what may occur in the future, however unwarranted they may be, will not support an action.

The representations averred in the declaration, which if false and known to be false at the time they were made, and from which this action may be maintained, are limited to the ownership of the mines, the working of them, and the output from them. The other matters averred constitute, by legal interpretation, representations as to opinions only.

A party has no right to rely on representations which amount merely to the statement of an opinion, judgment or expectation, or are vague and indefinite in their nature and terms, or are merely loose, conjectural or exaggerated statements. Buschman v. Codd, 52 Md., 202; Robertson v. Parks, 76 Md., 118.

Representations outside of a warranty, upon which the law authorizes a person to rely, must be of a fact either then existing or pre-existing, and not as to something to be done in the future, nor a mere opinion or inference as to the effect or result of a certain fact or facts then existing or pre-existing. Wade v. Ringo, 122 Mo., 322.

Prudence and caution must be exercised. The representations must be such that an ordinarily prudent man would rely on as true, to justify a person in relying upon them.

Press v. Hair.

Grier v. Puterbaugh, 108 Ill., 602; Hutchinson v. Lyford, 123 Ill., 300; Eames v. Morgan, 37 Ill., 260.

This court said in Dickinson v. Atkins, 100 Ill. App., 401: "To sustain an action for deceit, it must be established that the representations complained of were false; that they related to matters material to the transaction, and not solely to promises as to matters *in futuro;* that the defendant making the false representations then knew them to be false, and that the plaintiff, exercising ordinary prudence, relied upon them as true, and to his injury. Wheeler v. Randall, 48 Ill., 182; Merwin v. Arbuckle, 81 Ill., 501; Schwabacker v. Riddle, 99 Ill., 343; McBean v. Fox, 1 Ill. App., 177; Budlong v. Cunningham, 11 Ill. App., 28; Sherburne v. Tobey Furn. Co., 19 Ill. App., 615."

Many of the instructions given are faulty in the particulars which we will now proceed to indicate.

The first instruction entirely omits the *scienter* necessary to sustain the action. This is fatal error. No judgment can be permitted to stand unless the representations charged were known to be false at the time they were made. Another serious objection is evident in this instruction, in that the jury are left to conjecture as to what averments in the declaration constitute the fraud and deceit charged. Many acts charged in the declaration do not constitute fraud and deceit, but are mere matters of opinion. It was too great a latitude to give the jury in leaving them to decide what acts charged constituted fraudulent representations. They may have arrived at their verdict under this instruction from the belief that the representations as to the future earnings and financial value of the mine or the stock of the corporation constituted fraud. It also omits the qualification that plaintiff exercised ordinary care and prudence to avoid deception.

Instruction 2 omits entirely the requirement that the false representations were of material matters of fact existing or pre-existing, and the exercise of ordinary care and prudence, and is susceptible of being understood as relating to matters *in futuro.*

The 3rd, 4th, 6th and 7th instructions are without fault.

The 5th instruction is subject to many of the infirmities above criticised, particularly in omitting reference to the care and prudence incumbent upon Hair to exercise in acting upon the representations alleged to be false.

The 8th instruction practically told the jury that notwithstanding Hair might, by the exercise of ordinary care and prudence, have discovered the falsity of the representations of Press before giving his note for $2,400 in payment of the 24 shares of stock which he received for that note, such fact would not be a bar to a recovery. This was clearly erroneous, and the inverse statement of the governing legal principle.

The 9th instruction is equally vulnerable to the objection that it states an erroneous principle of law, that in an executory contract founded on fraud the defrauded party may, after discovery of the fraud, and with knowledge of it, proceed to perform the contract and recover damages in an action for deceit. As applied to this case, where the performance referred to in the instruction consisted in the giving of the note in payment for the stock, it was misleading. On discovering the fraud, the contract could have been repudiated, the stock refused and the note withheld.

An instruction which told the jury that if, by an ordinary degree of precaution, the plaintiff could have ascertained the falsity of the representations complained of, then the plaintiff was not entitled to recover, was held a correct statement of the law in Eames v. Morgan, 37 Ill., 260. In criticising an instruction which omitted this element, the court said in Schwabacker v. Riddle, *supra,* "Again, under this instruction a recovery may be had, although the plaintiff was deceived from a total want of reasonable care on his part." The like element of care and prudence was held essential in Antle v. Sexton, 137 Ill., 410, and Endsley v. Johns, 120 Ill., 470.

The complaint that appellee's instructions did not inform the jury that his case must be maintained by a preponderance of the evidence, lacks force under the well-settled rule that the instructions must be read as a series and construed with

reference to each other.   So doing, we find the rule as to the *quantum* of evidence is sufficiently stated in instruction 12 proffered by appellant and given to the jury.

We come now to the instructions proffered by appellant, and about which he complains.   Instructions 13 and 14 refused as tendered, but given as modified by the trial judge, did not constitute error.   Instruction 15 was rightfully refused, as every essential element in it was contained in instruction 14 given.

The judgment of the trial court must be reversed as being against the weight of the evidence and for errors in the giving of instructions as herein indicated.   As said in Peaslee v. Glass, 61 Ill., 94, "there are very few cases where a jury should find a verdict for the plaintiff upon his unsupported testimony alone, when that testimony is positively contradicted by the defendant.   *   *   *   Without saying that this court would set aside a verdict on the ground alone that it was not sustained by the evidence, we must set aside one resting only upon the evidence of the plaintiff when that is contradicted not only by the defendant, but also by another witness, and there are no elements of probability to turn the scale."   All of which is equally applicable here.

Hair's testimony as to the representations made by Press charged as false, has no support, but is flatly contradicted by Press, and four other unimpeached witnesses contradict Hair upon every other material point in his testimony.

In Thompson v. Fullinwider, 5 Ill. App., 551, the court say:  "We deem it unnecessary to review the evidence at length, as we think appellee's testimony was fairly overcome and that a new trial should have been granted."   O'Malley v. Chicago City Ry., 30 Ill. App., 309; C. & E. I. Ry. v. Donworth, 203 Ill., 192.

It is highly important to the determination of the facts that the jury should be left free, in arriving at their verdict, to gather from the evidence whether or not appellee was in the exercise of due care and diligence to avoid being deceived on the material matters alleged as constituting fraud and deceit, and not to be hampered in such determination by erroneous

instructions calculated to divert their attention from the material to the immaterial averments of the declaration. The instructions must be so certain in law as to direct the jury's attention to the charges in the declaration and the evidence supporting them which entitles appellee to recover, if the evidence is sufficient on which to ground a recovery. They must be left free, in judging both of the falsity of the material representations and in determining the question of due care and prudence, to the proofs as to whether or not the Williams contract was made known to Hair as being the only rights which Press had in the mining property, and as to whether his possession was in virtue of that contract, or that he made the statement that he owned the same at the time he first induced Hair to agree to take 25 shares of stock; whether he saw the Williams contract and heard it read at the meeting at which the Storm Cloud Gold Mining Company elected its officers and perfected its organization, April 26, 1908; whether or not he seconded the motion that the company purchase Press' interest in the Williams contract for 996 shares of its capital stock; and whether or not on the next day he heard the minutes of that meeting read, and approved of the same, together with all the other evidence bearing upon these questions.

In what we have said we do not wish to be understood as deciding the questions of fact presented by this record, for we do not, but leave those questions for settlement on another trial of the case, which may be had on a remanding of the cause, conformable to the views here expressed.

For the errors designated in this opinion, the judgment of the Superior Court is reversed and the cause remanded for a new trial.

*Reversed and remanded.*